SOMONT OIL COMPANY, INC., Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Somont Oil Co. v. Commissioner
Docket No. 18905-89
United States Tax Court
T.C. Memo 1991-245; 1991 Tax Ct. Memo LEXIS 288; 61 T.C.M. (CCH) 2772; T.C.M. (RIA) 91245; June 4, 1991, Filed *288 Decision will be entered under Rule 155. Marc G. Buyske, for the petitioner. Thomas E. Ritter, for the respondent. TANNENWALD, Judge. TANNENWALD
MEMORANDUM OPINION Respondent determined the following deficiency in, and additions to, tax for petitioner's 1985 fiscal year: Taxable Year
Additions to Tax Under Secs.
Ended Deficiency
6653(a)(1) [1]
6653(a)(2)
6661
3/31/85
$ 282,659.00
$ 14,133.00
* $ 70,665.00
After concessions, the remaining issue for decision is whether respondent correctly disallowed, as a nondeductible capital expenditure, a portion of the total expenditures paid by petitioner to a third party to locate foreign investors. *289 All of the facts have been stipulated, and the stipulation of facts and the attached exhibits are incorporated herein by reference. Petitioner is a corporation with its principal places of business in Spring, Texas, and Shelby, Montana. Petitioner's primary activities include oil exploration, drilling, and sales. In 1979, petitioner and Energy Transportation Engineering (ETE) entered into discussions in which ETE represented that it could locate foreign capital to invest in the oil business. As a result, petitioner and ETE entered into a letter agreement on December 29, 1979. The agreement provided for a payment to ETE of 15 percent of the total dollars invested by foreign investors. The agreement also provided for a payment of 15 percent of the sales for the first 2 years, if any; this term was interpreted by the parties, and performed accordingly, as a percentage of sales of the gross production, if any, allocable to the producer of the properties developed with the funding located by ETE. Such gross production was the production before expenses of development and not otherwise allocable to existing and outstanding royalty interests. After several unsuccessful efforts, *290 ETE did locate foreign investors in 1982. Once ETE put petitioner in contact with the foreign investors, it had nothing further to do with any arrangements made between petitioner and the foreign investors. However, following negotiations between petitioner and the foreign investors as to the manner by which a contribution of funds would be made, a joint venture, known as the K-S Ventures, was formed. Under the terms of this joint venture, the foreign investors contributed $ 550,000.00 for a 99-percent interest in the partnership until recovery of 75 percent of their investment and for a 49-percent interest thereafter, and petitioner received the remaining interests in exchange for its contribution of land and services. The foreign investors received the return of their contribution within 12 months following the completion of their investment obligation under the agreement between such investors and petitioner. Pursuant to the letter agreement, petitioner made an initial payment to ETE of $ 82,500.00 (15 percent of $ 550,000.00) on November 8, 1984, which represented the initial 15-percent payment required by the agreement. The payment was charged to an account called "Contract *291 Labor, MT" and deducted on petitioner's 1985 fiscal year corporate income tax return. Following commencement of production, as of March 1985, the subsequent payments, based on a percentage of gross sales due and payable to ETE pursuant to the letter agreement, totaled $ 236,045.94. On December 11, 1984, petitioner made a payment of $ 100,922.00 to ETE as a partial payment. The oil wells were so successful, producing significantly more than the oil field's normal rate, that petitioner decided to negotiate a buy out of the 2-year percentage-of-sales payments due pursuant to the letter agreement. A final payment of $ 152,216.00 was negotiated, and payment was made on March 25, 1985. Of this amount, $ 135,123.94 was allocated to payments due under the letter agreement, and the remainder ($ 17,092.06) represented the balance of the buy out of ETE's interest. The payments were charged to an account called "Contract Labor, MT" and deducted on petitioner's 1985 fiscal year corporate income tax return. During the buy-out negotiations, as a consequence of receiving periodic production information, ETE knew the amount currently due it pursuant to the letter agreement but did not know *292 the amount which would accrue during the remaining period of the agreement. Respondent argues that the three payments petitioner made to ETE during its 1985 fiscal year, totalling $ 335,638.00, are nondeductible capital expenditures. Petitioner asserts: (1) That the payments to ETE based on a percentage of gross sales, i.e., the $ 100,922.00 and the $ 135,123.94 payments plus the $ 17,092.06 buy-out payment, do not represent gross income in the first instance because they are production payments; (2) that the payment to ETE, i.e., the $ 82,500.00, based on a percentage of the funding contributions located by ETE is an expenditure incident to locating financing and amortizable over a 12-month period; or alternatively (3) that all payments to ETE are deductible as ordinary and necessary business expenses under section 162. Petitioner bears the burden of proving that respondent's determination is incorrect. Rule 142(a); Welch v. Helvering, 290 U.S. 111, 78 L. Ed. 212, 54 S. Ct. 8 (1933). For the following reasons, we reject petitioner's arguments and hold that all payments made to ETE constitute nondeductible capital expenditures. In order for the payments that petitioner made to ETE to *293 constitute a production payment, and thereby be excluded from petitioner's income, ETE must have acquired an "economic interest in such mineral in place." Section 1.636-3(a)(1), Income Tax Regs., provides in part: a) Production Payment. (1) The term "production payment" means, in general, a right to a specified share of the production from mineral in place (if, as, and when produced), or the proceeds from such production. Such right must be an economic interest in such mineral in place. * * * A right to mineral in place which can be required to be satisfied by other than the production of mineral from the burdened mineral property is not an economic interest in mineral in place. A production payment may be limited by a dollar amount, a quantum of mineral, or a period of time. * * * [Emphasis supplied.] Section 1.636-1(a), Income Tax Regs., cross references the term "economic interest" to section 1.611-1(b), Income Tax Regs., which provides in part: (b) Economic Interest. (1) * * * An economic interest is possessed in every case in which the taxpayer has acquired by investment any interest in mineral in place or standing timber and secures, by any form of legal relationship *294 * * * to which he must look for a return of his capital. * * * A person who has no capital investment in the mineral deposit or standing timber does not possess an economic interest merely because through a contractual relation he possesses a mere economic or pecuniary advantage derived from production. For example, an agreement between the owner of an economic interest and another entitling the latter to purchase or process the product upon production or entitling the latter to compensation for extraction or cutting does not convey a depletable economic interest. Further, depletion deductions with respect to an economic interest of a corporation are allowed to the corporation and not to its shareholders. In Missouri River Sand Co. v. Commissioner, 83 T.C. 193, 198-199 (1984), affd. 774 F.2d 334 (8th Cir. 1985), we stated: The test for determining whether a taxpayer possesses an economic interest is whether the taxpayer has (1) acquired by investment any interest in the mineral in place, and (2) whether the taxpayer looks to the income derived from the extraction of the mineral for a return of his investment. Palmer v. Bender, 287 U.S. 551, 557, 77 L. Ed. 489, 53 S. Ct. 225 (1933); *295 sec. 1.611-1(b), Income Tax Regs. Although an economic interest does not require that money actually be invested in the minerals in place ( Weaver v. Commissioner, 72 T.C. 594, 602 (1979)), "There must exist some element of 'ownership' in the mineral deposit 'in place' and a right to share in the income from its production." Holbrook v. Commissioner, 65 T.C. 415, 419 (1975). A mere economic advantage derived from production, however, does not constitute an economic interest. Commissioner v. Southwest Exploration Co., supra [350 U.S. 308 (1956)]; sec. 1.611-1(b)(1), Income Tax Regs. The determination of whether a taxpayer has an economic interest depends upon the facts in each case. Ramey v. Commissioner, 398 F.2d 478, 479 (6th Cir. 1968), affg. 47 T.C. 363 (1967). In the present case, the relevant terms of the letter agreement provide: For those foreign investors ETE brings to our attention that ultimately invest in our drilling ventures, we shall pay a fee to ETE of 15% of the total dollars invested plus 15% of the first two years' sales (if any). This provision is simply *296 insufficient to satisfy the requirements of an "economic interest." ETE clearly made no investment by way of services rendered to any mineral project. The investments in the project were made by the foreign investors and petitioner. To be sure, the payments to ETE were dependent upon the project in which the foreign investors it obtained helped to capitalize. But such a dependency without more does not provide the necessary substance, by way of services, provision of capital, or making the mineral properties available to the project, to satisfy the investment requirement established by the decided cases. Commissioner v. Southwest Exploration Co., 350 U.S. 308, 100 L. Ed. 347, 76 S. Ct. 395 (1956). Cf. Zuhone v. Commissioner, 883 F.2d 1317 (7th Cir. 1989), affg. a Memorandum Opinion of this Court. Van Slyke v. Kelm, 107 F. Supp. 229, 234 (D. Minn. 1952), relied upon by petitioner, emphasized that the taxpayer's interest, received in exchange for services rendered in negotiating leases, was "closely interwoven with that of the fee owners." Similarly, in Commissioner v. Rowan Drilling Co., 130 F.2d 62 (5th Cir. 1942), affg. 44 B.T.A. 189 (1941), *297 and Smith v. United States, 17 F. Supp. 353 (S.D. W.Va. 1936), the taxpayer's production payment was acquired for services rendered directly to the mineral project. The long and short of the matter is that ETE simply obtained an economic advantage by virtue of its arrangement with petitioner. Helvering v. Bankline Oil Co., 303 U.S. 362, 367, 82 L. Ed. 897, 58 S. Ct. 616 (1938); Missouri River Sand Co. v. Commissioner, 83 T.C. at 199. Aside from the presence or absence of an investment, petitioner fails to meet the second requirement of a production payment; namely, ETE did not look solely to the production of the oil for payments based on a percentage of sales. Although pursuant to letter agreement ETE did bear the risk of nonpayment if there were no actual sales of oil, the parties have stipulated that petitioner acquired only a 1-percent interest in the joint venture until the foreign investors recovered 75 percent of their investment. Given this stipulation, we fail to see how petitioner could have satisfied its obligation to pay 15 percent of the gross sales revenues, assuming actual sales were made, to ETE from amounts derived solely from production *298 during the time it had only a 1-percent interest, but such payments must have been from some additional alternative source. See Paragon Jewel Coal Co. v. Commissioner, 380 U.S. 624, 635, 14 L. Ed. 2d 116, 85 S. Ct. 1207 (1965); Anderson v. Helvering, 310 U.S. 404, 406, 84 L. Ed. 1277, 60 S. Ct. 952 (1940); Christie v. United States, 436 F.2d 1216, 1219-1221 (5th Cir. 1971). See also sec. 1.636-3 (a)(1), Income Tax Regs., supra pages 5-6. In this regard, we reject petitioner's assertion that its 1-percent interest was a net interest based on partnership income after deducting all expenses, including the payments to ETE. There is nothing in the stipulated record to indicate such an arrangement, including the partnership return, and the fact that this case has been submitted fully stipulated does not relieve petitioner of its burden of proof. Rule 122(b); Borchers v. Commissioner, 95 T.C. 82, 91 (1990), on appeal (9th Cir., Oct. 9, 1990); Service Bolt & Nut Co. Trust v. Commissioner, 78 T.C. 812, 819 (1982), affd. on other issues 724 F.2d 519 (6th Cir. 1983). We hold that ETE did not receive an economic interest in the oil *299 in place sufficient to constitute the amounts in question production payments, and therefore such amounts represent income to petitioner. We also reject petitioner's argument that the amount ($ 82,500) paid to ETE based on a percentage of funding contributions represents an expenditure to secure financing and is amortizable over a 12-month period. By no stretch of the imagination can the financing obtained by ETE for projects being developed by petitioner be equated to a loan to petitioner, much less a loan with a predictable term at inception sufficient to support an amortization deduction. The fact that, in hindsight, the foreign investors were repaid some or all of their original contributions within 12 months is simply beside the point. We next address petitioner's alternative argument that all payments to ETE constitute ordinary and necessary expenses deductible under section 162. Expenditures which are directly related to the acquisition process, such as legal, brokerage, accounting, and other similar costs, must be capitalized as part of the cost of the asset. See Woodward v. Commissioner, 397 U.S. 572, 25 L. Ed. 2d 577, 90 S. Ct. 1302 (1970); sec. 1.263(a)-2, Income Tax Regs. The *300 tax consequence of a particular payment depends on the nature of the services performed rather than its designation or treatment by the taxpayer. Nicolazzi v. Commissioner, 79 T.C. 109, 124 (1982), affd. 722 F.2d 324 (6th Cir. 1983). In Vestal v. United States, 498 F.2d 487 (8th Cir. 1974), the Court of Appeals for the Eighth Circuit held that a commission or a finder's fee paid by the taxpayer to acquire investors must be deemed "'costs incurred in the acquisition or disposition of a capital asset * * * to be treated as capital expenditures.'" 498 F.2d at 495. [2] In the present case, petitioner's payments to ETE related to locating and securing the necessary capital for the formation of the joint venture. Such expenditures are akin to start-up expenses and constitute capital expenditures under section 263 and do not represent ordinary and necessary expenses under section 162. See Honodel v. Commissioner, 722 F.2d 1462, 1468 (9th Cir. 1984), affg. on this issue 76 T.C. 351 (1982); Madison Gas & Electric Co. v. Commissioner, 633 F.2d 512 (7th Cir. 1980), *301 affg. 72 T.C. 521 (1979); Cagle v. Commissioner, 539 F.2d 409, 415 (5th Cir. 1976), affg. 63 T.C. 86 (1974); Hardy v. Commissioner, 93 T.C. 684 (1989). Petitioner seeks to avoid this consequence by arguing that the efforts of ETE to obtain financing for petitioner's projects were simply a part of petitioner's on-going business activities. Assuming without deciding that under such circumstances the amounts paid to ETE would be currently deductible, cf. Duffy v. United States, 231 Ct. Cl. 679, 690 F.2d 889 (1982), the fact of the matter is that the record herein simply does not contain sufficient evidence to reflect the necessary foundation for such a conclusion. In this respect, as is the case with other arguments advanced by petitioner, see supra page 9, petitioner has not met its burden of proof. Finally, we reject petitioner's *302 argument based upon Pressed Steel Car Co. v. Commissioner, 20 T.C. 198 (1953), that the buyout payment of $ 17,092.06 should be deductible because it released petitioner from an obligation burdensome to its business. As far as the record herein discloses, the reason for the payment might well have simply represented an astute business decision. Cf. H. and G. Industries, Inc. v. Commissioner, 495 F.2d 653 (3d Cir. 1974), affg. 60 T.C. 163 (1973). For the foregoing reasons, Decision will be entered under Rule 155. Footnotes
1. All statutory references are to the Internal Revenue Code as amended and in effect for the year in issue, and any Rule reference is to the Tax Court Rules of Practice and Procedure.↩
*. 50 percent of the interest payable under sec. 6601 with respect to the portion of the underpayment attributable to negligence or intentional disregard.↩
2. See also Mathiasen v. Commissioner, T.C. Memo 1961-325↩.